IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA         :

v.                                :         Crim. No. 25-366

DARYL F. HELLER                   :

## GOVERNMENT'S MOTION FOR PRETRIAL DETENTION

The United States of America, by and through David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and Francis A. Weber and J. Andrew Jenemann, Assistant United States Attorneys for the District, submits this brief in support its motion for pretrial detention.

### I.     Introduction

The defendant stands before this Court charged by indictment with perpetrating a massive fraud scheme that allegedly caused approximately $402 million in investor losses. Due to the magnitude of the scheme, the defendant faces a substantial period of incarceration if he is convicted on the charged offenses, and his unique financial position—where, according to filings by his attorneys in Bankruptcy Court, he has control over assets valued at as much as $75 million—renders him a significant risk of flight. Additionally, there is no reason to believe that the defendant could comply with pretrial conditions of release given his demonstrated ability to lie under to oath, violate Court orders, and obstruct this investigation. In sum, because the defendant represents an extreme flight risk and no condition or combination of conditions will ensure that he appears as directed by the Court, he should be detained pending trial in this matter.

## II.     Legal Standard

The Bail Reform Act provides that if "after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." *See* 18 U.S.C. § 3142(e)(1).

To determine whether a defendant should be detained pending trial, the Court must "take into account the available information concerning" four factors. 18 U.S.C. § 3142(g). First, the Court must examine the "nature and circumstances of the offense charged." *Id.* § 3142(g)(1). Second, it must look at the "weight of the evidence against the person." *Id.* § 3142(g)(2). Third, it must examine the history and characteristics of the defendant. *Id.* § 3142(g)(3). Finally, it must weigh "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* § 3142(g)(4).

## III.    Discussion

The defendant is charged with securities fraud and wire fraud in connection with a seven-year long scheme to obtain approximately $770 million from approximately 2700 investors through materially false representations. The investors are facing losses of principal of approximately $402 million. While the charged offenses undoubtedly caused great harm, the government acknowledges that the first and fourth factors under 18 U.S.C. § 3142(g) do not weigh in favor of pretrial detention because the charges are nonviolent in nature and the defendant's pretrial release does not endanger to the community. The second and third factors, however, weigh heavily in favor of detention.

2

The second factor—the weight of the evidence against the defendant—weighs heavily in favor of pretrial detention. As alleged in the Indictment, from January 1, 2017 to December 2024, the defendant solicited, and caused others to solicit, investments in automated teller machines ("ATMs"), by falsely representing, among other things, that investor money going to be used to buy and operated ATMs and investors would receive a monthly payment that was supposed to be derived from the revenues of the ATMs purchased with investor money for a period of approximately seven years. The defendant was the majority owner and controller of Prestige Investment Group, LLC ("Prestige"), which was responsible for managing the funds into which the investors invested ("Prestige and WF Velocity ATM Funds"). The defendant was also the majority owner and controller of Paramount Management Group, LLC ("Paramount"), the company responsible for buying and operating the ATMs on behalf of the investors.

As alleged in the Indictment, instead of using the money to buy ATMs, the defendant caused a substantial amount of the investor money to be used to pay earlier investors, his own personal expenses, and business expenses of other companies owned and operated by him. The defendant carried out the long-running fraud scheme by, among other things, lying to prospective investors, current investors, individuals who solicited investors on behalf of Prestige, Prestige employees, and others. In order to carry out the scheme, the defendant regularly created fake documents purporting to show that the investor money was used properly and the ATMs were profitable enough to make investor payments. The scheme began to collapse in late 2023, when Paramount stopped receiving large amounts of new investor money. Without this new investor money, Paramount was unable to make payments to old investors, and so the defendant caused Paramount to stop paying investors in April 2024. The government's evidence includes, among

other things, numerous emails written by the defendant containing demonstrably false reports regarding the ATMs allegedly sold to the Prestige and WF Velocity ATM Funds and financial records showing the use of new investor money for unauthorized reasons, such as paying earlier investors and the defendant's personal expenses and business debts.

With respect to the potential penalties that the defendant faces, based on information currently known to the government, if the defendant proceeds to trial and is convicted, he faces an advisory guidelines' range of over 20 years' imprisonment. If the defendant accepts responsibility and pleads guilty, he faces an advisory's guidelines range in excess of 15 years' imprisonment. The government is still evaluating how many of the 2700 alleged victims suffered substantial financial hardship and other guidelines issues, which could result in a higher advisory guidelines range. *See, e.g.*, USSG § 2B1.1(b)(2) (4-level increase in the offense level if the crimes caused 5 or more victims to suffer substantial financial hardship, and 6-level increase if the crimes caused 25 or more victims to suffer substantial financial hardship). These potential penalties, when coupled with the weight of the evidence against him, creates a strong incentive to flee prior to trial.

The third factor—the history and characteristics of the defendant—also weighs strongly in favor of detention for several reasons.

First, the defendant is in a very unique financial position that renders him a significant flight risk. On February 10, 2025, he filed a Chapter 11 bankruptcy in the District of New Jersey. Case No. 25-11354 (D.N.J.), ECF No. 1. He filed in New Jersey because his "principal

4

asset" was a property located at 7605 Pleasure Ave., Sea Isle, NJ.¹ *Id.* at 2. The defendant listed assets valued between $100,000,001 and $500,000,000 and liabilities in that same range. *Id.* at 6.

On August 1, 2025, the defendant filed a proposed Chapter 11 plan—i.e., his proposal for how he intended to repay his creditors. According to the plan, it "will be funded by a combination of income from the Debtor's entities and primarily from the sale of assets owned or wholly owned by entities." ECF No. 434-1 at 3. The assets are identified as Heller Capital Group ("HCG"), of which the defendant is a 99.5 percent owner, and Heller Investment Holdings, LLC ("HIH"), of which he is an 85 percent owner. *Id.* at 3–4. The plan estimated an annual salary of approximately $40,000. *Id.* HCG has a fair market value of $15,000,000 to $25,000,000, and according to the plan, "[t]he Debtor proposes a rapid liquidation of all HCG entities to occur in approximately eighteen (18) to twenty-four (24) months, or sooner, which will occur through various liquidation events and will result in a final dissolution of HCG." *Id.* at 6. In other words, based on his representations to the Bankruptcy Court, the defendant has control over assets valued at $15,000,000 to $25,000,000, and, under his plan, he will the person responsible for selling the assets and delivering the proceeds to his creditors. There are no conditions of release that would prevent the defendant from using these assets to flee instead of paying his creditors.

Likewise, the defendant's plan states that HIH has a market value of $15,000,000 to $25,000,000. *Id.* For HIH:

---

¹ This property was subsequently sold, and the proceeds of the sale will go to the defendant's creditors. ECF No. 169.

5

> The Debtor proposes that HIH continue to hold assets to generate cash flow. Such cash flow after payment for management fees, third-party accounting/finance/IT fees, and legal and similar administrative fees, will be paid to the Plan for the benefit of creditors. The cash flow will be added to funds resulting from liquidation of assets. The HIH proposal allows for maximizing values and divesting assets over a period of ten (10) years or less, [t]his will allow assets to be liquidated, at strategic times when assets hit maturity and scale which will maximize value for creditors. As a result, this strategic liquidation should increase the HIH asset value to approximately $35,000,000-$50,000,000.

*Id.* at 6. As with his HCG holdings, the defendant could easily use this estimated $35,000,000 to $50,000,000 in assets to flee instead of paying his creditors. The defendant's unique financial position renders him a flight risk in that he does not appear to have the ability to post any collateral to secure his appearance in this case yet would have sole dominion over millions of dollars through the liquidation of HCG and HIH.[2]

A review of the defendant's history and characteristics also shows his inability to comply with any conditions of release imposed by the Court. Since at least October 2024, the defendant had been aware of the FBI's investigation, when individuals associated with the Prestige and WF Velocity ATM Funds disclosed to investors that the FBI had been conducting witness interviews. On December 5, 2024, the FBI went to the defendant's house to execute a search warrant for the house, his person, and his phone. The FBI knocked on his front door and announced their presence. The defendant saw the agents at his front door yet failed to leave the residence until

---

[2] On August 27, 2025, the Bankruptcy Court issued an Order to Show Cause on why the Court should not appoint a trustee or convert the case to a Chapter 7 liquidation, in which case the defendant would no longer be control of property of the bankruptcy estate, including HCG and HIH. ECF No. 520. As of the morning of September 4, 2025, a trustee had not been appointed.

approximately 18 minutes later.  While executing the warrant, agents located a laptop computer located in the defendant's dedicated office space.  The laptop computer was propped open on the defendant's desk as if it had been in use:



Forensic examination of the laptop, however, showed that the most recent log in to the laptop was in March 2024—over eight months after the above picture was taken.  Investigators have obtained evidence that the defendant was using a different laptop, with a serial number ending 3TKDC6, in the December 2024 timeframe.  This evidence includes body worn camera footage of the defendant using a laptop in this same office during an interview conducted by the Lancaster County Police Department in early October 2024 related to a burglary of the defendant's residence.  On the day of the defendant's arrest on September 3, 2025, the FBI seized from this same room the laptop with a serial number ending in 3TKDC6.  It thus appears that the defendant concealed this laptop from the FBI on December 5, 2024.

In addition to his apparent obstruction of the investigation, the defendant gave false testimony to the Lancaster County Court of Common Pleas on August 26, 2024.  He testified under oath, among other things, (i) Paramount manages "probably somewhere around 30,000

between 25- and 30,000 [ATMs]" and ATMs owned by non-Prestige and WF Velocity ATM Fund investors constituted an "insignificant" amount of that number; and (ii) Paramount's network of 25,000 to 30,000 ATMs was "by and large" operating normally. *Prestige Fund A, LLC, et al. v. Paramount Management Group, LLC*, Case No. 24-06012 (Lancaster C.C.P.), August 26, 2024 Emergency Injunction Hearing at 44:7 to 45:15; 47:3 to 47:11. Contrary to these representations, Paramount records show that as of August 2024, the total amount of ATMs in Paramount's ATM network was approximately 16,900 and approximately 6,792 of these ATMs could not have been sold to investors since Paramount was providing processing services only for that subset.

Additionally, as alleged in the Indictment, on or about November 21, 2024, the defendant was ordered by the Court in the *Prestige Fund A, LLC v. Paramount* matter to provide to counsel for the Prestige and WF Velocity ATM Funds a complete inventory of the ATMs that the investors allegedly owned and the information necessary to operate the ATMs. In response, as further alleged in the Indictment and contrary to the Court's order, the defendant: (i) caused Paramount to sell ATMs that were purportedly sold to the Prestige and WF Velocity ATM Fund investors and to use most of the sale proceeds to pay a creditor of Paramount; and (ii) provided to counsel for the investors a list of ATMs that the defendant knew was grossly overstated and false. Specifically, the defendant provided a list of approximately 28,000 ATMs, and authentic Paramount records showed that, at the time, Paramount had approximately 9,984 ATMs within its network and later analysis showed that only approximately 5,028 of these ATMs were owned by the Prestige and WF Velocity ATM Funds and their investors.

While the defendant undoubtedly has strong ties to the community due to his lifelong residence in Lancaster County, the government notes that many of the approximately 2700 investors are from that community as well. And to be sure, pretrial conditions of release can include electronic location monitoring, home detention, and oversight over his financial affairs. These conditions, however, can be circumvented—especially by a defendant who purports to have access to and dominion over millions of dollars in business assets—and rely on the unlikely prospect of the defendant being truthful with Pretrial Services regarding his whereabouts and financial affairs. Moreover, these conditions (or others) are insufficient to ameliorate the flight risk that the defendant presents due to the substantial amount of incarceration that he faces if convicted, the strength of the evidence against him, his long record of deceit, his apparent obstruction of this investigation, and the prospect of him having control over millions of dollars through his planned liquidation of HCG and HIH.

## IV.   Conclusion

For the reasons discussed above, because there is no condition or combination of conditions that reasonably assure the appearance of the defendant as required, the defendant should be detained pending trial.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Francis A. Weber*
FRANCIS A. WEBER
J. ANDREW JENEMANN
Assistant United States Attorney

Dated:  September 5, 2025

**CERTIFICATE OF SERVICE**

I certify that a copy of the Government's Motion for Pretrial Detention was served on defense counsel of record via email to:

    Christopher J. Adams, Esq. (cadams@mccarter.com)
    Daniella Gordon, Esq. (dgordon@mccarter.com)


                                 /s/ Francis A. Weber
                                 FRANCIS A. WEBER
                                 Assistant United States Attorney


Date:   September 5, 2025